**John A. BOTT and Jac Products, Inc. Plaintiffs,**

v.

**FOUR STAR CORPORATION, Defendant.**

**Nos. 79–71438, 86–CV–70176–DT.**

United States District Court, E.D. Michigan, S.D.

June 28, 1993.

Michael Hainer, Financial Law Associates, Jeffrey Sadowski, Harness, Dickey, & Pierce, Troy, MI, Thomas P. Casey, Harper Woods, MI, for plaintiffs.

Robert Franzinger, Dykema Gosset, Detroit, MI, for MASCO.

S. Thomas Wienner, Feeney, Kellett & Wienner, Birmingham, MI, for Ralph Mandarino, Decorative Technologies, Inc., Automotive Design Technologies, Inc. and FSC Associates.

Dennis Egan, Butzel Long, Detroit, MI, for Ltd. Partners of FSC Associates.

Alan Bean, Silver, Gould, Eizelman, Zoller & Jackier, Bloomfield Hills, MI, for James McLernon.

Sheldon Toll, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for NBD.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

This the judgment collection stage of patent infringement cases. Plaintiffs, John A. Bott (Bott) and JAC Products, Inc (JAC) (collectively, "Plaintiffs"), brought suits against defendant, Four Star Corporation (Four Star), for, *inter alia,* infringement of patents owned by Bott and licensed to JAC. In these cases, judgments were entered for Plaintiffs on the claim of patent infringement against Four Star for damages and prejudgment interest in the amount of $7,156,959.[1]

---

1. Plaintiffs' judgments resulted from two patent infringement cases against Four Star. In the first, *Bott v. Four Star Corp.,* 229 U.S.P.Q. 241, 1985 WL 6071 (E.D.Mich.1985), *aff'd in part and rev'd in part,* 807 F.2d 1567 (Fed.Cir.1986) ("Bott I"), Amended Final Judgment was entered on March 18, 1987 against Four Star in favor of Bott for damages of $282,147.00, in favor of JAC for damages of $998,847.00, and in favor of Plaintiffs jointly for $283,000.00 for attorneys' fees as a sum certain as of February 9, 1987. In the second, *Bott v. Four Star Corp.,* No. 86–CV–70176–DT (E.D.Mich. Jan. 11, 1988), *aff'd,* 848 F.2d 1245 (Fed.Cir.1988) ("Bott II"), a Supplemental Final Judgment was entered on Decem-

Plaintiffs say that only $383,817 of the judgments have been paid and that, with post judgment interest, in excess of $9,000,000 remains unpaid. Now before the Court is Plaintiffs' motion styled "Plaintiffs' Second Amended Motion For Proceedings Supplementary To And In Aid Of Judgments And For An Order To Show Cause Why Certain Persons Should Not Be Impled" (Motion to Implead). For the reasons which follow, the motion will be granted in part and denied in part.

## II.

### A.

Plaintiffs assert that essentially all of the business assets of Four Star were transferred to other parties through several connected or related transactions. Plaintiffs say that these transactions were fraudulent as against the Plaintiffs and have defeated their ability to collect the unpaid judgments. To effect collection of the judgments against Four Star, Plaintiffs move to implead Masco Industries, Inc. (Masco), Mesick Metal Products, Inc. (Mesick), Huron/St. Clair, Inc. (Huron), Ralph Mandarino (Mandarino), Decorative Technologies, Inc. (Decorative), Automotive Design Technologies, Inc. (ADT), FSC Associates (FSC), Morton Harris (Harris), John Fauver (Fauver), James McLernon (McLernon), Erwin Ziegelman (Ziegelman), and NBD Bank, N.A. (NBD) (collectively "Impleader Defendants"). Mesick and Huron are subsidiaries of Masco. Mandarino is president of Decorative and ADT, and, together with his wife, owns all of the stock of each. The stock of Four Star was owned in varying proportions by Mandarino, Harris, Fauver, McLernon and Ziegelman, each of whom also served as directors of Four Star. FSC is a Michigan limited partnership consisting of the former shareholders/directors of Four Star: Mandarino, is general partner,

ber 11, 1988 against Four Star in favor of Plaintiffs for $5,592,965.16, plus statutory interest.

**2.** Masco's Response was filed on November 12, 1992 and, as such, responds only to Plaintiff's initial motion. Plaintiffs' amended motion, included as Plaintiffs' Exhibit 36, was filed on November 25, 1992.

and Harris, Fauver, McLernon and Ziegelman, are limited partners. NBD, through its subsidiary NBD Business Finance, Inc. (NBDBF), was a secured creditor of Four Star.

### B.

On October 14, 1992, Plaintiffs filed a motion styled "Plaintiffs' Motion For Proceeding Supplementary To And In Aid Of Judgments And For An Order To Show Cause Why Certain Persons Should Not Be Impled," which sought to implead all of the Impleader Defendants except NBD. On November 25, 1992, Plaintiff's filed a motion styled "Motion To Implead NBD Bank, N.A.," the brief in support of which contained as Exhibit 36 and incorporated by reference a paper styled "Plaintiffs' Amended Motion For Proceeding Supplementary To And In Aid Of Judgments And For An Order To Show Cause Why Certain Persons Should Not Be Impled," which merged the two motions. Responsive papers were separately filed by (1) Mandarino, Decorative, ADT and FSC, (2) Masco, Mesick & Huron, (3) Harris, Fauver, McLernon and Ziegelman, and (4) NBD. A hearing was held on December 16, 1992, at which time certain Impleader Defendants inquired whether the motion before the Court was Plaintiffs' original motion or the amended motion.[2] The Court directed Plaintiffs to file an amended motion identifying all of the parties and claims.

### C.

On January 29, 1993, Plaintiffs filed the Motion to Implead now before the Court. Plaintiffs assert the following claims against the Impleader Defendants:

I. Fraudulent transfer in violation of the Michigan Fraudulent Conveyance Act, M.C.L. § 566.11, et seq.;[3]

**3.** Michigan's Fraudulent Conveyance Act, M.C.L. § 566.11, et seq., states in pertinent part:
    Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods or things in action, or any rents or profits issuing therefrom, and any charge upon lands, goods or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay or defraud creditors or other

II. Conspiracy to commit fraudulent transfers;

III. "Piercing The Corporate Veil/Alter Ego Against Mandarino And His Controlled Corporations";

IV. "Successor Liability Of Masco"; and,

V. "Conspiracy to Commit Common Law Fraud."

Responsive papers have been separately filed by (1) Mandarino, Decorative, ADT and FSC, (2) Masco, Mesick & Huron, (3) Harris, Fauver, McLernon and Ziegelman, and (4) NBD.

### III.

The following facts and allegations are gleaned from the papers before the Court:

### A.

*Auctioned of Assets of Four Star*

The basis upon which Plaintiffs' move to implead the several Impleader Defendants is best summarized as follows:

On information and belief, immediately after the [United States Court of Appeals for the Federal Circuit] rendered its last decision in October of 1988, Masco and Four Star, in collusion with NBDBF and in bad faith, orchestrated a sale of the assets of Four Star to Masco (or its subsidiaries) through an alleged foreclosure sale. This alleged foreclosure sale allowed NBDBF to be repaid all or a major portion of its outstanding loan balance of approximately $1,825,000.00, while transferring all or substantially all of the assets of Four Star to Masco (or one of its subsidiaries).

Plaintiffs proffer an agreement executed between Masco and NBDBF as contained in a document dated November 4, 1988 (Masco–NBDBF Agreement) [4] in which Masco made the following "Offer":

[T]o purchase from [NBDBF] all of the rights of Four Star in Four Star's equipment and machinery which is more particularly described in Exhibit A attached

persons of their lawful suits, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, decree or judgment suffered, with the like intent, as against the persons hindered, delayed or defrauded, shall be void.

hereto and Four Star's intellectual property which is more particularly described in Exhibit B hereto, free and clear of the interest of [NBDBF] and any security interest or lien subordinate thereto and the interests of Four Star, at a foreclosure sale by auction by [NBDBF] upon the terms and conditions stated herein.

The purchase price stated in the agreement was $1,825,000, to be bid at auction. The schedule of equipment and machinery attached as Exhibit A to the Masco–NBDBF Agreement identified a "Total Fair Market Value" of $1,834,975 and a "Total Forced Liquidation Value" of $1,326,400. The schedule of intellectual property, labeled "Schedule Of Patents, Patent Applications And Trademarks Of Four Star Corporation" attached as Exhibit B to the Masco–NBDBF Agreement, which did not indicate a value, contained lists of "Apparatus Patents" and "Design Patents" and included "Pending Patent Applications" and "Trademarks." The schedule of intellectual property also contained the following description in a paragraph labeled "Other Intellectual Property":

All of Four Star Corporation's inventions, improvements, knowhow, trade secrets, copyrights, designs, disclosures, patent applications, patents, design patent applications, design patents, trademarks, trademark registrations and applications for trademark registrations relating to luggage racks and grab rails, and to all other products of the type sold by Four Star in the course of its business, including but not limited to the items listed above.

Plaintiffs admit receiving notice of the foreclosure sale, and proffer the "Notice of Secured Party's Sale" (Notice),[5] which states that NBDBF intends to sell "in bulk ... the machinery, equipment and intellectual property of the Debtor (the "Collateral")" at a public auction conducted at the Four Star plant in Mesick, Michigan on November 29,

4. *See* Exhibit 18 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

5. *See* Exhibit 19 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

1988. The Notice also stated, in relevant part:

> 7. The sale will operate to transfer to the purchaser for value all of Debtor's right, title and interest in the Collateral, free of the security interest of Secured Party and any security interest or lien subordinate thereto.
>
> 8. The Secured Party has received a bid in the amount of $1,825,000 (the "Opening Bid"). Such further offers as shall be made at the sale by such offeror or any other bidder shall be in increments of $25,000. The Collateral shall be sold to the last highest bidder.
>
>    *     *     *     *     *     *
>
> 10. Debtor plans to operate and remain in business up to the date of the auction. The owner of the premises on which Four Star operates its business may offer a lease to the successful bidder for a term of 5 years at a rent not greater than $4.00 per square foot per annum, with other terms of the lease to conform to the Detroit Real Estate Board Form—Business Property Lease. Anyone interested in such a lease should contact Ralph Mandarino, ...
>
> 11. The Secured Party shall sell with reserve. The Secured Party reserves the right to withdraw any or all of the assets from the sale in which case the Opening Bid described above will be reduced appropriately....

Plaintiffs assert, however, that they "were misled as to the nature of the assets to be sold." Plaintiffs assert that they were not informed of the Masco–NBDBF Agreement or that Four Star "had secured the luggage rack business of Chrysler" and that it would be included as an asset at the sale.

Plaintiffs also assert that they were not informed that the assets described under the heading "Other Intellectual Property," *supra*, were included in the auction sale. Plaintiffs proffer a fax sent to an attorney of Plaintiffs from counsel for NBDBF [6] transmitting a schedule of the intellectual property of Four Star subject to sale at auction; the schedule did not include the section "Other Intellectual Property." The "Other Intellectual Property" is included in the schedule attached to the Masco–NBDBF Agreement [7] and in the schedule attached to the bill of sale executed after the auction to Mesick.[8]

Plaintiffs assert that the "Other Intellectual Property" omitted from the schedule of intellectual property provided to them was "precisely [the] intellectual property that Masco asserted to be 'a valuable commercial asset' in the state court lawsuit between the parties." [9] In the portion of the state court complaint to which Plaintiffs point, Masco alleged:

> 11. Prior to and during 1988, through long and extensive research and development and the expenditure of considerable time and effort and large sums of money, Four Star produced and developed substantial and commercially valuable intellectual property. This intellectual property includes trade secrets and confidential, proprietary, scientific, technical and business information and patent application rights relating to research, development, production and marketing of luggage racks. This intellectual property was and is reflected, *inter alia*, in written materials, drawings, procedures, equipment and the like. Said intellectual at all times material to this complaint has constituted a valuable commercial asset.[10]

Plaintiffs say that they only became aware of the transfer of the "Other intellectual

---

6. *See* Exhibit 22 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

7. *See* Exhibit 18 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

8. *See* Exhibit 23 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

9. *Masco Industries, Inc. v. John A. Bott, et al.*, Wayne County Circuit Court Case No. 91–127987, filed October 18, 1991 (Wayne Circuit

case). *See* Exhibit 2 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

10. Paragraph 11 of "Complaint For Breach Of Contract, Tortious Interference With Contract And Theft Of Trade Secrets, Intellectual Property And Patent Application Rights" in the Wayne County case.

Property" as a result of the Wayne Circuit case. Plaintiffs indicate that the Wayne Circuit case has been settled,[11] but do not describe the relevance, if any, of it to the matter now before the Court, nor can the Court discern its relevance.

Finally, Plaintiffs assert that the auctioned assets of Four Star, including the undisclosed "Other Intellectual Property," were transferred to Masco and its subsidiaries, principally the Mesick subsidiary.

## B.

### *Purchase Price for Four Star's Auctioned Assets*

#### 1.

Plaintiffs assert that the purchase price of $1,825,000 was insufficient consideration for the auctioned assets. Plaintiffs' assertion is based on the appraised fair market value of the machinery and equipment alone at $1,834,750. Plaintiffs assert that the auction price was not only below the fair market value of the machinery and equipment, but that the purchase price reflected no consideration being paid for the intellectual property and no consideration for what Plaintiffs termed "Additional Assets":

In addition, the Auctioned Assets purportedly did not contain any contract rights, customer orders, inventory, work in progress, finished goods, goodwill, going concern value, accounts receivable, raw materials, furniture, goods, fixtures, motor vehicles, tools, fittings and accessories or other intangibles of Four Star ("Additional Assets").

Plaintiffs proffer Four Star's unaudited financial statement of June 30, 1988,[12] which states accounts receivable of $2,135,000; inventory of $1,100,000; furniture and fixtures of $357,000; and proprietary tooling of $638,000. Plaintiff assert that these assets, with a total value as of June 1988 of $4,230,000, were not identified in the Notice, but were transferred to Masco or its subsidiaries without payment of consideration. Plaintiffs assert that, since Masco continued the operations of Four Star after the auction, Masco must have acquired these "Additional Assets." Plaintiffs also proffer the termination statement filed by NBDBF on December 1, 1988,[13] releasing its security interest in:

All inventory, whether raw materials, work in progress or finished goods, including material used or usable in the manufacturing, processing, packaging or shipping of inventory; all goods, including, but not limited to, machinery, equipment, furniture, furnishing and fixtures, all motor vehicles; and all accessories, tools fittings and parts thereof; and the collateral described on Exhibit A attached hereto and made a part hereof.

Exhibit A to the termination statement is a copy of the intellectual property schedule attached to the Masco–NBDBF Agreement and the bill of sale; it includes the "Other Intellectual Property" provision.

Plaintiffs also proffer a Bill of Sale,[14] dated December 1, 1998, indicating the private sale to Masco of:

all inventory located at the former place of business of Four Star Service Corporation, 6305 West M–115, Mesick, Michigan 49668, whether new materials, work in process or finished goods including materials used or usable in the manufacturing, processing, packaging or shipping of inventory, except certain obsolete items which Purchaser has agreed to return for cash refund to the vendor or vendors of such items and Purchaser agrees to remit said cash refunds to Seller.

These assets were sold for $436,717.81.[15]

Plaintiffs also assert that Masco acquired the contract rights of Four Star, including a

---

**11.** *See* Plaintiffs Brief in Support of Motion, filed October 14, 1992, at page 7, n. 3.

**12.** *See* Exhibit 24 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**13.** *See* Exhibit 26 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**14.** *See* Exhibit 25 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**15.** No reason is offered by NBDBF, Masco or Mandarino, for conducting a private sale of these assets contemporaneously with the public sale of the equipment, machinery and intellectual property.

contract to supply luggage racks to Chrysler Corporation (Chrysler) for the Jeep Cherokee.

Plaintiffs assert that NBDBF was aware, in March of 1988, that Four Star was anticipating a purchase order from Chrysler for luggage racks; that Four Star was offered for sale to Masco for $4,980,000, *see infra* III.C.; and that the Chrysler business was separately valued by Four Star at $6,000,000.

### 2.

Mandarino's response states that Four Star had become insolvent and had ceased its business operations prior to the auction sale of its assets. Mandarino asserts that the injunction issued by the Court against Four Star practicing the infringing patents prevented Four Star from supplying luggage racks to Chrysler and rendered Four Star insolvent. Mandarino further asserts that the injunction against Four Star resulted in Plaintiffs capturing 100% of the Chrysler business for the Jeep Cherokee.

### 3.

Masco's response states that Plaintiffs misstated the value of Four Star's assets by relying on the appraised "Total Fair Market Value" of the machinery and equipment of $1,834,750, rather than the appraised "Total Forced Liquidation Value" of 1,326,400.[16] Masco asserts, based on the liquidation value of the machinery and equipment, that its auction bid included nearly $500,000 for the purchase of Four Star's intellectual property.

Masco further responds that Plaintiffs misrepresent the value of Four Star's assets by attributing a $6,000,000 value to Chrysler luggage rack business for the Jeep Cherokee when Plaintiffs supplied 100% of that business during the period following the auction sale.[17]

### C.

*Negotiation for Sale of Four Star to Masco*

### 1.

Plaintiffs say that during the pendency of the patent infringement action, Four Star and Masco conducted negotiations concerning the acquisition of Four Star assets or shares by Masco.[18] Plaintiffs proffer a letter from Mandarino to Masco on September 24, 1987 referring to accompanying updated financial information.[19] Plaintiffs also proffer the Confidential Disclosure Agreement executed between Four Star and Masco on March 17, 1988,[20] which addresses "a design of a luggage rack tubular side rail" and states that its inducements is: "WHEREAS, Four Star desires to disclose the Confidential Information to Masco to facilitate discussions of a possible acquisition by Masco of a license under intellectual property rights that Four Star may have in the Confidential Information." Also included as an exhibit to Plaintiffs' motion is an August 30, 1988 letter from Mandarino to the president of Huron conveying a "preliminary prospectus on the stamping and decorative trim business."[21] Plaintiffs' assert: "These document establish that in late summer, 1988, Four Star was soliciting Masco to pay somewhere between $2,400,000 and $6,200,000 for all or part of Four Star."

Plaintiffs proffer a document styled "Alternative Means of Acquisition."[22] The document is not dated and bears no signature. Plaintiffs assert that it was prepared for Masco by its counsel. The document describes different methods by which Masco or its subsidiary, Huron, could acquire Four Star: private foreclosure sale, public fore-

---

**16.** *See* schedules attached to Masco–NBDBF Agreement in Exhibit 18 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**17.** No documentary support for this assertion is included in Masco's papers.

**18.** Plaintiffs allege that these "secret" negotiation were commenced between the entry of the Amended Final Judgment in "Bott I," on March 18, 1987 and the Supplemental Final Judgment in "Bott II," on December 16, 1988. *See supra* note 1.

**19.** *See* Exhibit 10 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**20.** *See* Exhibit 11 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**21.** *See* Exhibit 15 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**22.** *See* Exhibit 36 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

closure sale, purchase related to Chapter 7 bankruptcy proceeding, a purchase related to Chapter 11 bankruptcy proceeding. The document discusses the advantages and/or disadvantages of each method of acquisition.

### 2.

Mandarino responds that, when Four Star became insolvent, *see supra* III.B.2., he undertook negotiations with Masco and others, including Plaintiffs, in an effort to effect a sale of Four Star assets to avoid foreclosure on the debt owing to NBDBF.

### D.

### *Four Star Indebtedness to NBD*

Masco and Mandarino both state that Plaintiffs assertions of fraudulent conveyance rest on the factual allegation that Four Star was indebted to NBDBF for $1,825,000. Masco and Mandarino both proffer a letter from NBDBF to the former shareholder/directors of Four Star,[23] dated October 30, 1989, stating that Four Star's indebtedness to NBDBF as of November 30, 1988 was $2,959,303. Masco asserts that NBDBF faced a deficiency of more than $1,000,000 following the foreclosure sale and posits that there can be no demonstration of collusion between Masco and NBD when the bank suffered a deficiency after the foreclosure sale. The letter describes the status of the Four Star indebtedness as follows:

| | |
|---|---:|
| Loan Balance 11–30–88 | $2,959,303 |
| Legal fees, costs, expenses | 207,810 |
| Interest Dec. 88—Sept. 89 | 64,667 |
| Inventory Sale | ( 436,718) |
| Equipment Sale | (1,825,000) |
| Accounts Receivable Collections | ( 696,921) |
| BALANCE DUE | $ 273,141 |

The letter is addressed to the former shareholder/directors because each had personally guaranteed a portion of the Four Star indebtedness and NBDBF was proceeding on these guarantees. The final settlement of the Four Star indebtedness, as described in a letter from NBDBF addressed to Mandarino on January 9, 1990,[24] was based on NBDBF and the former shareholder/directors reaching an agreement to discharge the remaining Four Star indebtedness for $130,000, distributed among the guarantors based on the former percentage of ownership of Four Star as follows:

| | | |
|---|---|---:|
| Ralph Mandarino | 61.9% | $ 80,470 |
| Morton E. Harris | 21.4% | 27,820 |
| John Fauver | 8.4% | 10,920 |
| James W. McLernon | 4.5% | 5,850 |
| Erwin C. Ziegelman | 3.8% | 4,940 |
| TOTAL | | $130,000 |

Mandarino responds that on the total Four Star indebtedness, after the foreclosure sales, collection of receivables and settlement with the guarantors, NBDBF suffered a loss of $143,141. Mandarino argues that Plaintiffs position is thus "reduced to the absurd proposition that NBDBF conspired to defraud itself."

### E.

### *FSC and the Mesick Plant*

### 1.

FSC owns a manufacturing plant located in Mesick, Michigan, which it previously leased to Four Star as Four Star's primary manufacturing facility.

---

**23.** *See* Masco Exhibit A; Mandarino Exhibit 1.   **24.** *See* Mandarino Exhibit 2.

**2.**

Plaintiffs assert that FSC leased the Mesick plant to Masco after the auction at a rate of $4.00 per foot per annum, an increase from the $1.57 paid by Four Star resulting in an increase of $132,000 in the annual revenues of FSC. Plaintiffs argue that this is a diversion of a portion of the true purchase price of the Four Star assets to its former shareholder/directors through a lease arrangement.

**3.**

Mandarino (for FSC) says that the lease of the Mesick plant to Masco is the product of an arms-length transaction, under the terms of which Masco acquired an option to purchase the property at the end of the five year lease. Mandarino asserts that the higher rent was intended to reduce the option purchase price and make the exercise of that option more attractive to Masco.[25]

Harris, Fauver, McLernon and Ziegelman say that the lease of the Mesick plant to Masco is a commercially reasonable transaction at an appropriate rental rate.

**F.**

*Mandarino–Masco Agreements*

**1.**

Plaintiffs assert that Mandarino entered into a Sales Representative Agreement with Masco (Sales Agreement),[26] which Mandarino assigned to ADT, "thereby diverting the purchase price to himself." Plaintiffs also assert that Mandarino entered into a Consulting Agreement with Masco (Consulting Agreement),[27] which Mandarino assigned to ADT, "again diverting the purchase price to himself."

**2.**

Mandarino responds that Plaintiffs have not demonstrated any improper purposes for the Sales Agreement or Consulting Agreement and asserts that these relationships

with Masco are merely a reflection of the facts that Mandarino has marketable talents and familiarity with the business being conducted by Masco and that he is without the employment and income previously provided to him through his ownership interest in Four Star.

**G.**

*Masco Counter–Allegations:*

**1.**

Masco devotes a significant portion of its response to the assertion that:

At the time of the auction, Bott was actively engaged in a scheme to defraud Four Star and its creditors of Four Star's new luggage rack design for the XJ vehicle. Because of this scheme, Bott could not have been misled into failing to bid at the auction [as] he claims. Recently, Bott's fraudulent scheme was thwarted because Bott was compelled to abandon his claim of ownership of the invention and patent application relating to a new luggage rack design for the Jeep Cherokee in settlement of litigation filed by Masco. The thwarting of Bott's fraudulent scheme is the only plausible reason for Bott's untimely filing of his present motion. Based on these facts, Bott's claims are barred by Bott's unclean hands and by laches, waiver, estoppel and res judicata.[28]

**2.**

The relevance of this characterization of Plaintiffs' motivation is uncertain. Considering the perambulations of the Jeep Cherokee luggage rack business since the commencement of the Bott/Four Star litigation, it is not surprising the contest between competitors for the business finds expression in the papers before the Court.

---

**25.** No documentary support, such as a copy of the lease, is included in Mandarino's response.

**26.** *See* Exhibit 27 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**27.** *See* Exhibit 29 to Plaintiffs' Statement of Facts in support of Second Amended Motion.

**28.** Brief Of Ralph Mandarino, Et Al In Opposition To Plaintiffs' Second Amended Motion For Proceedings Supplementary To And In Aid Of Judgments And For An Order To Show Cause Why Certain Persons Should Not Be Impled, pp. 7–8.

## IV.

### A.

Rule 69(a) of the Federal Rules of Civil Procedure provides, in relevant part:

In aid of the judgment or execution, the judgment creditor or a successor in interest when that interest appears of record, may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held.

The applicable state practice is set out in M.C.L. § 600.6104, which provides in relevant part:

After judgment for money has been rendered in an action in any court of this state, the judge may, on motion in that action or in a subsequent proceeding:

(1) Compel a discovery of any property or things in action belonging to a judgment debtor, and of any property, money, or things in action due to him, or held in trust for him;

(2) Prevent the transfer of any property, money, or things in action, or the payment or delivery thereof to the judgment debtor;

(3) Order the satisfaction of the judgment out of property, money, or other things in action, liquidated or unliquidated, not exempt from execution;

(4) Appoint a receiver of any property the judgment debtor has or may thereafter acquire; and

(5) Make any order as within his discretion seems appropriate in regard to carrying out the full intent and purpose of these provisions to subject any nonexempt assets of any judgment debtor to the satisfaction of any judgment against the judgment debtor.

M.C.L. § 600.6134 provides:

For the purposes of this chapter a person is deemed to be indebted to the judgment debtor, although any debt in question has been assigned, charged or encumbered by the judgment debtor, if the assignment, charge or encumbrance is fraudulent as against creditors or is otherwise voidable.

■ It is well settled that whether impleader should be permitted at this juncture is committed to the sound discretion of the Court. Fed.R.Civ.P. 14. The inquiry focuses on whether there is sufficient reason for the requested exercise of the inherent and express authority of the Court to aid in the collection of its judgments and, if so, what relief is appropriate.

### B.

■ The impleader turns on whether there is a sufficient demonstration that NBDBF, acting in concert with Masco, Mandarino and their related parties, proceeded with an "intent to hinder, delay or defraud" Plaintiffs, rather than exercising its rights as a prior perfected secured party in the assets of Four Star. There is no dispute that NBDBF held perfected security interests in all of the Four Star assets transferred to Masco and that NBDBF's interest was superior to Plaintiffs' interest as judgment lien creditor. It is not disputed that Four Star had defaulted on its debt obligations to NBDBF. It is not disputed that a properly executed foreclosure by NBDBF would extinguish the interests of Plaintiffs.

Beyond these matters, however, there are sufficient differences as the true nature and purposes of the challenged transactions to warrant the exercise of the Court's discretion to implead the Impleader Defendants and proceed to the merits of the asserted claims and defenses.

### C.

#### 1.

■ Having determined that impleader is proper, it is necessary to define the scope of relief granted at this juncture. The claims asserted by Plaintiffs and the relief requested go beyond the appropriate bounds at the stage of impleading third parties that are alleged to have received assets of Four Star in derogation of the ability of Plaintiffs to collect the judgments. "Impleading those persons whose interests may be affected by the Court's rulings is necessary to both acquire jurisdiction over them, and to afford

them the essential elements of procedural due process.... Such impleading, however, does not imply liability on the part of the implied third parties." *Mission Bay Campland v. Sumner Financial Corp.,* 71 F.R.D. 432, 434–35 (M.D.Fla.1976) (citations omitted) (applying Florida law).

### 2.

■ The Court is satisfied that the claims denominated in the Motion to Implead as Count II (conspiracy to violate the Michigan Fraudulent Conveyance Act) and Count V (conspiracy to commit common law fraud) should be brought as plenary actions and, as such, are not appropriate to proceedings in aid of the judgments. *See* M.C.L. § 600.-6113(1): "Proceedings under this chapter are special proceedings, and shall be heard by the judge without a jury, except as provided in subsection (3) of section 6128 [persons claiming adversely to judgment debtor and not parties to proceeding may request jury determination of title if added to the proceeding]."

It is on the basis of these claims that Plaintiffs seek to impose joint and several liability on the Impleader Defendants for the judgments, shifting the focus from whether the Impleader Defendants possess assets of Four Star subject to execution by the Plaintiffs to whether the Impleader Defendants have sufficient assets to satisfy the judgments. Plaintiffs have not offered any authority which supports an effort to reach the general credit of the Impleader Defendants. Accordingly, insofar as the Motion to Implead asserts plenary causes of action for conspiracy to defraud and seeks to impose joint and several liability on that basis, the motion will be denied.

### 3.

■ In addition to impleader, Plaintiffs request broad injunctions against all of the Impleader Defendants.[29] At this juncture, there has been no determination that any of the Impleader Defendants possess assets improperly transferred from Four Star and, therefore, it would be premature to impose transfer restraints upon the Impleader Defendants under M.C.L. § 600.6119(1).[30] Consequently, the injunctive relief sought by Plaintiffs is treated as a request for a preliminary injunction. However, Plaintiffs have not shown that they will suffer irreparable harm or that they are likely to prevail on the merits of their claims. *See In re DeLorean Motors,* 755 F.2d 1223, 1228 (6th Cir.1985). Moreover, the requested injunctive relief is premised, in large part, on the assertion that the general credit of the Impleader Defendants may now be reached by Plaintiffs, which assertion the Court has rejected.[31]

### V.

Accordingly, Plaintiffs' motion is GRANTED in part and DENIED in part as follows:

(1) Masco, Mesick, Huron, Mandarino, Decorative, ADT, FSC, Harris, Fau-

---

**29.** In addition to impleading the Impleader Defendants, Plaintiffs' requested relief also includes:

   (A) enjoining Masco from making any payments "of any kind" to FSC and its general or limited partners other than pursuant to the lease agreement;

   (B) enjoining FSC from making distributions to its general or limited partners;

   (C) enjoining *Masco from any sale or transfer of assets now owned by Masco which were ever owned at any time by Four Star;*

   (D) enjoining Masco from making any payments "of any kind" to Mandarino, Decorative, ADT under the *Sales Agreement or Consulting Agreement;*

   (E) enjoining all Impleader Defendants from any transfers which "relates in any way to Four Star or any [t]ransfer of any assets of Four Star, directly or indirectly to Masco,

     *the business or assets of Masco or the luggage rack business of Four Star or Masco;"* (emphasis added).

   (F) holding that *"the Defendant and the parties to be impled are liable, jointly and severally, to the Plaintiffs for the judgments."* (emphasis added).

**30.** M.C.L. § 600.6119(1) provides for transfer restraints against "a third party having in his or its possession property or moneys belonging to the judgment debtor or who is indebted to the judgment debtor...." By its terms, this section contemplates a determination that the assets are properly regarded as belonging to the judgment debtor, not simply an allegation to that effect.

**31.** Reaching the general credit of the Impleader Defendants must be distinguished from tracing assets and proceeds, which the Court does not address at this juncture.

ver, McLernon, Ziegelman, and NBD are IMPLEADED;

(2) The claim of conspiracy to violate the Michigan Fraudulent Conveyance Act, denominated as Count II in the motion, is DISMISSED;

(3) The claim of conspiracy to commit common law fraud, denominated as Count V in the motion, is DISMISSED;

(4) The injunctive relief requested is DENIED without prejudice;

(5) Plaintiffs shall have discovery of the appropriate Impleader Defendants, limited to the claims of violations of the Michigan Fraudulent Conveyance Act (Count I), piercing the corporate veil/alter ego (Count III), and successor liability (Count IV).[32]

The deputy clerk will schedule a status conference.

SO ORDERED.

---

**32.** Obviously nothing said in this Memorandum And Order is intended to suggest that Impleader Defendants, or any one or more of them, may not file a motion for summary judgment under Fed. R.Civ.P. 54(b). *But see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (trial court may "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."). *See also* William W. Schwarzer, Alan Hirsch & David J. Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441 (1992).